IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Robert A. Brown, et al.,           :

                                     Case No. 2:11-cv-1122

       Plaintiffs,           :

                                       JUDGE JAMES L. GRAHAM

    v.                                :

                                       Magistrate Judge Kemp

Tellermate Holdings Ltd.,          :
    et al.,

       Defendants.

## OPINION AND ORDER

### I. Introduction

There may have been a time in the courts of this country when building stone walls in response to discovery requests, hiding both the information sought and even the facts about its existence, was the norm (although never the proper course of action). Those days have passed. Discovery is, under the Federal Rules of Civil Procedure, intended to be a transparent process. Parties may still resist producing information if it is not relevant, or if it is privileged, or if the burden of producing it outweighs its value. But they may not, by directly misrepresenting the facts about what information they have either possession of or access to, shield documents from discovery by (1) stating falsely, and with reckless disregard for the truth, that there are no more documents, responsive or not, to be produced; or (2) that they cannot obtain access to responsive documents even if they wished to do so. Because that is the essence of what occurred during discovery in this case, the Court has an obligation to right that wrong, and will do so in the form of sanctions authorized by Fed. R. Civ. P. 37.

### II. Procedural History

The plaintiffs in this case are Robert A. Brown and Christine M. Brown (the "Browns"). They were employed by

Tellermate, Inc., one of the defendants, until August 22, 2011, when their employment was terminated involuntarily.  Several months later, they brought this employment action against Tellermate Holdings Ltd., Tellermate, Inc., Insperity PEO Services, L.P., Paul J. Rendell, David W. Lunn, Gareth R. Davies, Edgar L. Bliss, John Pilkington, and Debra Elliott (all of whom, for ease of reference, the Court will call "Tellermate"), alleging age discrimination.

    Discovery did not go smoothly.  Numerous discovery conferences were held, numerous discovery motions were filed, and several discovery orders were issued.  Eventually, the Browns filed a motion under Fed. R. Civ. P. 37(b)(2)(vi) for judgment against all defendants and for other sanctions (Doc. 60).  They also filed a motion challenging Tellermate's decision to designate approximately 50,000 pages of documents produced in April, 2013 as "attorneys eyes only" (Doc. 65).  The Court held an evidentiary hearing on these motions which took place over the course of three days - December 18, 2013, February 26, 2014, and February 27, 2014.  At the close of the hearing, the Court offered the parties the chance to file post-hearing briefs, but they both chose not to.  Consequently, the issues raised by the Browns' motions are now ready for a ruling.

### III.  <u>The Facts</u>

    A short introduction to the basic problem in this case is appropriate before turning to a discussion of the facts, most of which - despite almost three days of testimony - are not in dispute.  As the reader moves through the statement of facts, it should become apparent that significant problems arose in this case for one overriding reason: counsel fell far short of their obligation to examine critically the information which Tellermate gave them about the existence and availability of documents requested by the Browns.  As a result, they did not produce

-2-

documents in a timely fashion, made unfounded arguments about their ability and obligation to do so, caused the Browns to file discovery motions to address these issues, and, eventually, produced a key set of documents which were never subject to proper preservation.  The question here is not whether this all occurred - clearly, it did - but why it occurred, and what, in fairness, the Court needs to do to address the situation which Tellermate and its attorneys have created.

Over the past decade, much discussion has been devoted to the topic of how the prevalence of electronically stored information (ESI) either has impacted, or should impact, discovery in civil actions filed in state and federal courts. While the preservation, review, and production of ESI often involves procedures and techniques which do not have direct parallels to discovery involving paper documents, the underlying principles governing discovery do not change just because ESI is involved.  Counsel still have a duty (perhaps even a heightened duty) to cooperate in the discovery process; to be transparent about what information exists, how it is maintained, and whether and how it can be retrieved; and, above all, to exercise sufficient diligence (even when venturing into unfamiliar territory like ESI) to ensure that all representations made to opposing parties and to the Court are truthful and are based upon a reasonable investigation of the facts.  As another Judge of this Court has observed, "trial counsel must exercise some degree of oversight to ensure that their client's employees are acting competently, diligently and ethically in order to fulfill their responsibility to the Court," Bratka v. Anheuser-Busch Co., 164 F.R.D. 448, 461 (S.D. Ohio 1995) (Graham, J.).  That holds true whether the bulk of the information relevant to discovery is ESI or resides in paper documents.

That guiding principle was not observed in this case.  As a

-3-

result, Tellermate, with the participation of its counsel, either intentionally or inadvertently failed to fulfill certain of its discovery obligations, leading to a cascade of unproductive discovery conferences, improperly-opposed discovery motions, and significant delay and obstruction of the discovery process.  All of this was accompanied by counsel's repeated and unequivocal statements about crucial facts concerning the discovery process - statements which, for the most part, turned out simply to be untrue.  As this Opinion and Order will explain, Tellermate's counsel:

> - failed to uncover even the most basic information about an electronically-stored database of information (the "salesforce.com" database);
>
> - as a direct result of that failure, took no steps to preserve the integrity of the information in that database;
>
> - failed to learn of the existence of certain documents about a prior age discrimination charge (the "Frank Mecka matter") until almost a year after they were requested;
>
> - and, as a result of these failures, made statements to opposing counsel and in oral and written submissions to the Court which were false and misleading, and which had the effect of hampering the Browns' ability to pursue discovery in a timely and cost-efficient manner (as well as the Court's ability to resolve this case in the same way).

These are serious matters, and the Court does not reach either its factual or its legal conclusions in this case lightly. However, each of the facts recited in this Opinion and Order is amply supported by the record in this case, including the testimony of Tellermate's own counsel.  The balance of this Opinion and Order will lay out the path by which the Court has reached its factual conclusions, and the legal principles which guide its discretion in fashioning an appropriate remedy.

A. Salesforce.com

The Court begins with the salesforce.com issue, because it views that issue to be the most significant.  Some background on the issue can be found in the Court's April 3, 2013 Opinion and Order granting the Browns' motion to compel discovery of documents in the salesforce.com database, but because the testimony at the hearing is more comprehensive than the factual submissions made in connection with the motion, the Court will restate the facts here.

Salesforce.com is a web-based application which allows businesses to track, among other things, their sales activities. It markets itself as "the world's #1 sales app."  See https:// www.salesforce.com/.  According to that same website, "Salesforce makes sales people more productive and allows them to focus on the things that matter most to grow their business."

The application works more or less in this manner.  Once a business signs a Master Agreement with salesforce.com, that business's sales agents or managers can create accounts for themselves on salesforce.com.  Each account gives the agent or manager access to a tool which allows that person to record all customer-related activity.  The account holder chooses the content.  Each account holder can then organize and search that content as needed.  Just as an example, a salesperson can record every contact with a particular customer over time, from emails to phone calls to letters to actual sales information (including importing emails or other external documents), and can then review that information each time a new contact with the customer is initiated.

Tellermate encouraged its sales people to use salesforce.com and acquired licenses for them to do so.  It entered into an agreement with salesforce.com governing the use of its accounts; a copy of that agreement is Exhibit E to Doc. 33, Tellermate's

-5-

memorandum in opposition to the Browns' second motion to compel discovery.  The agreement obligated salesforce.com to make its system available at all times except for scheduled outages, and also prohibited it from disclosing, modifying, or accessing a user's data except in certain very limited circumstances.  It also provided that salesforce.com acquired "no right, title or interest ... in or to [a user's] Data."  As described in greater detail below, the agreement did not restrict a user's access to that user's own data in any way.

With respect to Tellermate's use of the salesforce.com app, each licensed sales person - including both of the Browns - was responsible for setting up his or her own account with a unique username and password.  Once in the system, the Browns could see their own customer information, and Mr. Brown (who was a manager) could also see the information which had been recorded by other Tellermate employees, both those he supervised and those he did not.  Tellermate also designated at least two of its own employees, Paul Schneid and Elizabeth Gillette, as "administrators" of its salesforce.com accounts.  The Browns were regular users of salesforce.com up until the date of their termination.

As is typical in an employment discrimination case, Tellermate claims that the reason for the Browns' termination related to their work performance, while the Browns claim that this proffered reason was just a pretext for terminating them due to their age.  In their second request for production of documents, the Browns, as part of their effort to show that their sales performance was comparable to or superior to other Tellermate employees who were both younger than they and who were not terminated, asked for salesforce.com "reports" both for themselves and for a number of other employees whom they named in the request.  A copy of this document request can be found as

-6-

Attachment 1 to the Brown's motion to compel, Doc. 24; it is request No. 35. The phrase "salesforce.com reports" was defined broadly to include any information which the named employees placed into the salesforce.com database. After making a general objection to that request, Tellermate replied that "non-privileged documents, if any, responsive to this Request will be produced at a time and place to be mutually agreed upon by counsel for the parties." Id. at 27.

Notwithstanding that statement, Tellermate did not produce any salesforce.com information at all. The Browns, as required by Rule, tried to resolve this issue extrajudicially, but that produced no results. An informal discovery conference held on December 28, 2012 was similarly unproductive. Consequently, on February 25, 2013, the Browns moved to compel discovery. They asserted in their motion (Doc. 32) that "Defendants refuse to produce documents from SalesForce.com, a web-based reporting tool for Tellermate, on the grounds that they are prohibited from doing so." Id. at 6. The Browns also represented that from their own experience, this could not be true, because "a user can print out information from the site, and a phone call to the company [presumably salesforce.com] confirms it." Id. at 6-7. The Browns attached to their motion a letter written by Colleen Moran O'Neil, one of Tellermate's attorneys, dated February 22, 2013, which stated, among other things, that Tellermate would not and could not produce this information because:

- "Tellermate does not maintain salesforce.com information in hard copy format."

- "Tellermate cannot print out accurate historical records from salesforce.com ...."

- "[D]iscovery of salesforce.com information should be directed to salesforce.com, not Tellermate."

Doc. 32, Ex. 1, at 1. As any competent practitioner would know,

-7-

the first and third reasons do not justify a party's refusal to provide responsive information over which it has control.  And, as it turned out, the second reason was simply false.

The February 22, 2013 letter was neither the first nor the last time attorneys for Tellermate represented that Tellermate could not produce the requested information from salesforce.com. For example, in the memorandum (Doc. 33) it filed in opposition to the motion to compel, Tellermate said that

> - "Tellermate is contractually prohibited from providing salesforce.com information – including information Tellermate inputs into it – to third parties" (an untrue statement);
>
> - "In addition to the contractual prohibition on Tellermate providing salesforce.com information, Tellermate cannot provide the information Plaintiffs seek in any event" (also an untrue statement); and
>
> - "Tellermate can only access the salesforce.com database in real time; Tellermate cannot access historical salesforce.com data" (yet another untrue statement).

Tellermate concluded by describing the Browns' request for this information as "misguided [and] illegitimate." Id. at 3-4.

This same justification for not producing the information is present in a February 15, 2013 letter, also written by Ms. O'Neil, but phrased more emphatically; there, Ms. O'Neil stated, unequivocally, that "Tellermate does not possess or control data maintained in the salesforce.com database and is not at liberty to produce it in discovery or verify its accuracy or authenticity." (Doc. 33, Ex. A at 2).  She also represented that Tellermate could not access any of the Browns' historical information and that all historical information inputted by the Browns "resides with salesforce.com" and that it was "salesforce.com's ESI."  She concluded by stating "no one from Tellermate has access to ESI of salesforce.com from the time period requested" and confirmed that "Defendants have advised

-8-

repeatedly of these issues ...." <u>Id</u>. As evidenced by the affidavit of Ray P. Drexel, one of the Browns' attorneys (Hearing Ex. P2), which was admitted as a stipulation of what he would have testified to had he been called as a witness, counsel had made identical representations to the Court in a December 28, 2012 informal telephone conference which had been requested by the parties as part of their effort to resolve this issue without formal motions practice. Again, not a single one of these statements is true.

In fact, as Tellermate's client representative, Paul Rendell, testified at the hearing, it has always been the case that even though the information which Tellermate employees input into salesforce.com is stored on salesforce.com's database, any Tellermate employee with a login name and a password could access that information - including historical information - at any time. Tellermate also had, at all relevant times, at least one (and sometimes two) of its employees designated as salesforce.com administrators, meaning that they enjoyed the highest level of access to the salesforce.com information. One of them - Paul Schneid - used that access to cancel the Browns' salesforce.com access at or about the time the Browns were terminated, and also (as it turned out) changed their user names - a subject which will be discussed later in this Opinion and Order. But it was never true, at any time, that Tellermate was under a contractual obligation not to access or use its own information uploaded to salesforce.com by its own employees - something which, most reasonable people would (correctly) surmise could not possibly be true - or that it had no way to access that same information. The Tellermate - salesforce.com contract, which counsel did procure but then both misinterpreted and misrepresented to the Court - is discussed below. But anyone with the most rudimentary understanding of why Tellermate bought its sales representatives

-9-

licenses for the salesforce.com app would have known that the very utility of that application was that it allowed Tellermate's sales representatives to update and review information about each customer they served - that is, that the ability to add information to the database and to look at it later were both crucial to the proper and effective use of the application.

Two attorneys - Ms. O'Neil and her co-counsel, Alexander Reich - testified about this subject at the hearing.  Although the key issue about this information was whether Tellermate could actually produce it - which, by the time of the hearing, had been conclusively established - both Ms. O'Neil and Mr. Reich said that they had some concern, when the Browns asked for salesforce.com information, that the data which the Browns or others had recorded on salesforce.com was no longer accurate, and that Tellermate was motivated, at least in part, to withhold the information on that basis.  That justification also appears in several of Ms. O'Neil's letters.

This was clearly either a smokescreen or reflected a fundamental misunderstanding of the discovery process.  Ms. O'Neil and Mr. Reich acknowledged, under questioning from the Court, that if any of the Browns' information had been changed, that could only have been accomplished by a Tellermate employee to whom the Browns' salesforce.com accounts had been assigned after the Browns were fired.  They both agreed that a party which produces documents does not, by the act of production, vouch for the accuracy of the information contained in those documents, and they agreed that a party may not use its own alteration of data contained in a document as a reason for refusing to produce it. Obviously, were the rule otherwise, document production - especially of documents detrimental to the party producing them - would shrink drastically as that party frantically altered documents and then used its own misconduct as the very reason for

refusing to turn them over.

The statements counsel made about the potential "validity or authenticity" of the Browns' (and others') salesforce.com information raises a different issue, and it also illustrates the way in which counsel approached this matter. As Mr. Rendell testified, when an employee left Tellermate, it was the company's practice either to deactivate or transfer that employee's salesforce.com account. If any salesforce.com account were transferred to a new sales representative, all of the sales information in the account would then appear to have been created by that new user, although the information would not change just by virtue of the account having been reassigned. Rather, all of the information would appear when the new user logged in, just as it would have when the prior user did so. Similarly, if the account were deactivated instead of reassigned, the information in that account would not be destroyed. An account could be deactivated without changing the account's name, or it could be renamed when deactivated. In this case, Tellermate did not assign the Browns' accounts to new users, but it did (for reasons really not explained) change the accounts' user names. Bob Brown became "Free1free" and Christine Brown because "Chris2free."

What did not happen when any account continued to be used by the same sales representative, was reassigned to a new sales representative, or was deactivated (with or without a name change) was the preservation of the information in the account. To that extent, counsel were correct when they said that Tellermate could not guarantee the accuracy of any information from a salesforce.com account. In fact, Tellermate's designated salesforce.com administrators (and apparently other users with sufficient privileges) could still access any account (active or inactive, reassigned or renamed) and had the ability to change or delete information in the accounts. Moreover, sales

-11-

representatives with active accounts could routinely add, delete, or alter information in their own accounts. But counsel apparently did not know any of this when they represented they could not verify the accuracy of the data in the Browns' accounts; in fact, they did not know at the time they made these representations whether the Browns' or other sales representatives' accounts had been transferred to other employees or not, and were completely unaware of the fact that the names on the Browns' accounts had been changed and that the accounts had been deactivated. To the extent that they believed the accounts had been transferred, which appears to be what counsel believed Tellermate had told them, there is no evidence that counsel asked who the new users were, made any attempt to speak to them about accessing or retrieving the information in the Browns' accounts, or told anyone about the need not to alter that information - or, indeed, any information in the salesforce.com accounts - even though Tellermate received a preservation letter prior to suit, and not even after the Browns' served their document request. As the testimony given at the hearing shows, all of this information was clearly known to at least some Tellermate employees since Tellermate began using salesforce.com; had the right questions been asked of the right people, counsel would have known it as well.

But, ultimately, Tellermate did not base its non-production of the salesforce.com information on the supposed inaccuracy of that information. Rather, it steadfastly insisted that it could not produce the information even if it wanted to. However, the Court concluded, in its April 3, 2013 Opinion and Order, that Tellermate did have access to the information it claimed to be unable to produce. The Court noted that the Browns had presented actual evidence, in the form of Christine Brown's affidavit, that the salesforce.com information could be accessed by Tellermate

-12-

employees, whereas all of Tellermate's statements to the contrary were unverified and were not evidence, even though they had been made in letters signed by counsel, orally by counsel during the course of conferences with the Court, and in a memoranda signed by counsel.  The Court also rejected the argument that Tellermate required its sales personnel to use salesforce.com but had signed an agreement preventing it or its employees from accessing any information they recorded there, concluding both that the contract proffered by Tellermate did not say that, and that it seemed highly doubtful that anyone would have agreed to such an arrangement.  Having reached the conclusion that Tellermate had provided no factual or legal support for its claim that it could not produce the salesforce.com date, the Court directed it to do so.

Apparently, some time between the date of that order and May 9, 2013, Tellermate's attorneys found out that, indeed, they could produce all of the salesforce.com information that the Browns had asked for.  A computer-based document production was arranged for that date.  The Browns' attorney, John L. Chaney, and a forensic computer expert, Charles Matthew Curtin, went to the Columbus office of Tellermate's counsel, were given a computer, were provided with a login and password for salesforce.com (that of John Pilkington, a Tellermate director), and were invited to search the database.  After some time, it became apparent that the Browns' account names had been changed to those described above.  No one told Mr. Chaney or Mr. Curtin in advance that this had occurred.  Once that fact was learned, the Browns' representatives were able to access the current information in the Browns' accounts - although, as noted above, it is impossible to know now whether it was the same as when they left the company - and current information for other sales representatives.  The sufficiency of that production, and the

-13-

Browns' actions after it occurred, are discussed later in the context of what type of sanctions are appropriate here.

As one might expect, before turning the database over, counsel for Tellermate - in this instance, Mr. Reich - logged into salesforce.com and reviewed some of the information there. When he did so, which was sometime prior to May 9, 2013, he was not aware (having never been told by Tellermate) that the Browns' account names had been changed to Free1free and Chris2free.  He learned that information for the first time on May 9, 2013, when either Mr. Chaney or Mr. Curtin so advised him.

One other point needs to be made about the salesforce.com information.  The Browns did not ask just for their own information from salesforce.com, but also for information recorded by a number of other employees whom they named in their document request.  According to an exhibit prepared by Mr. Curtin after he reviewed a "document export" of salesforce.com information which Tellermate obtained and produced in January, 2014, a number of those people were still employed by Tellermate when the document request was served on or about June 20, 2012.  However, there is again no evidence that counsel made any effort to speak to any of those employees to find out if they could retrieve information from their salesforce.com accounts.  There is also no evidence that counsel ever visited the salesforce.com website, and there is no evidence that counsel made any effort to verify what the admittedly "limited number of people" (see Tr. Vol. III, at 546) at Tellermate had been saying about Tellermate's access to the salesforce.com data.

As discussed more fully below, counsel's performance in this regard fell well below what is required and expected of an attorney in this situation, and compounded the problem created by Tellermate when its representatives, according to Ms. O'Neil's testimony, told her things that were untrue.  It may be helpful

-14-

now to point out some additional facts that place this issue into a larger context.

The true facts show beyond a doubt that any ESI maintained on the salesforce.com database belonged to Tellermate.  The same would be true, of course, for other web-based applications; just because, for example, emails in a Google or Outlook account might be kept on a server owned or maintained by the email provider, it does not mean that the information in those emails belongs to the provider - just the opposite.  But Tellermate's counsel claimed not to appreciate that fact; Ms. O'Neil testified that it was not until about the time that the Court issued its April 3, 2013 Opinion and Order that she understood that the information in Tellermate's salesforce.com accounts was Tellermate's ESI.  She did, however, believe long before that date that the various accounts at issue here - including the Browns' accounts, since she thought they had been assigned to new users - were constantly being updated, and that as part of the updates, the users could add, delete or alter "historical data."  She testified that she did not direct any of these users not to do that, not when Tellermate received a preservation letter sent on October 4, 2011, and not at any time afterward.  She also knew that Tellermate did not routinely (or ever) make backup copies of the salesforce.com data.  She testified that she believed salesforce.com made backups, and that is one reason she suggested to the Browns that they send a subpoena for the information to salesforce.com; only it would have the type of "snapshot" records the Browns wanted, whereas any records maintained by Tellermate might be changing on a daily basis.

The problem with that approach, at least in this case, is that Ms. O'Neil apparently assumed, without verifying, that salesforce.com actually kept backup data.  From the evidence presented, it seems that the first time anyone associated with

-15-

Tellermate asked salesforce.com how much historical data it
maintained was on January 16, 2014, when Gareth Davies sent an
email asking salesforce.com that question.  That email, and the
written response sent by salesforce.com the next day, are found
in Plaintiff's Ex. 68.  In response to Mr. Davies' inquiry,
salesforce.com said that it did not keep backup files beyond "3
to 6 months from the current date."  Since Tellermate did not do
what Mr. Curtin described as a "data export" when the
preservation letter was received - although it had that
capability at the time - and because salesforce.com deleted any
backups that were more than 6 months old, it now appears to be
impossible for Tellermate to produce salesforce.com information
whose reliability can be guaranteed.  As Mr. Curtin testified,
there is no way now to look at information in the Tellermate
salesforce.com accounts, even if the information dates back to
the relevant time period, to determine whether anyone changed any
of that information or deleted any information which was once
present.  That situation is a direct result of two things:  (1)
Tellermate's and its counsel's failure to appreciate (or, in
Tellermate's case, failure to disclose) that the information
stored on salesforce.com belonged to Tellermate - i.e, that it
was Tellermate's ESI - and (2) the corresponding failure to take
steps to preserve that information, such as by asking
salesforce.com to keep the information longer than the usual
three to six months; or by asking for a backup copy of the
information when the preservation letter was sent; or by
Tellermate's extracting the data itself and then preserving it.
Consequently, although Tellermate has now, very belatedly,
produced a "data export" from its salesforce.com accounts, the
integrity of the information contained in that data export cannot
be verified beyond three to six months prior to the date it was
run.  And it was not run until late January, 2014.

-16-

As a final bit of context to all of this evidence, as the Court has noted and as it discussed in the April 3, 2013 Opinion and Order, Tellermate filed a copy of its agreement with salesforce.com in support of its argument that it was contractually prohibited from producing the information from Tellermate's employee accounts with salesforce.com.  (Doc. 33, Exhibit E).  As it pertains to the issues in this case, the agreement tells Tellermate that its data (described in the agreement as "Your Data") consists of "all electronic data or information submitted by You [i.e. Tellermate] to the Purchased Services," and it specifically prohibits salesforce.com from disclosing that data to anyone other than in response to a subpoena or court order or "as expressly permitted in writing by You" - a fairly good indication of who actually controlled the data.  Coupled with that is a provision that "We [i.e. salesforce.com] acquire no right, title or interest from You ... in or to Your Data," again implying, if not stating outright, that the data inputted by Tellermate employees belonged to Tellermate.

As to preservation, the agreement makes no mention of how long salesforce.com would store data or how often it would back it up; the closest it comes to addressing that subject is a provision in ¶4.2 that "We shall maintain appropriate administrative, physical, and technical safeguards for the protection of the security, confidentiality and integrity of Your Data. We shall not ... modify your Data ...."  That language does not address any time frames or procedures for data preservation, nor does any other provision of the agreement.  Perhaps the agreement is silent on this point because Tellermate, like any other user, always retained the ability to export its own data, and by doing so it could make and maintain its own backup files as often as it wanted.

There are two important points to be made about this agreement.  First, no cogent argument could have been made, based on its language, that Tellermate was legally prohibited from accessing and producing its own information in discovery, although counsel made exactly that argument in response to the motion to compel.  Second, no fair reading of the agreement supports the assumption that salesforce.com was going to back up the information in Tellermate's accounts on any periodic basis, or that it could somehow control Tellermate's ability to change or delete information from the database.  In fact, the agreement is either silent on this point or implies just the opposite.  The failure to advise Tellermate to preserve that information if, as counsel testified, that failure was based entirely on the belief that salesforce.com was doing it - although there is also no evidence that anyone asked salesforce.com to preserve the information - is almost inexplicable.

B. <u>The Frank Mecka Documents</u>

One might conclude that the failings of Tellermate and counsel concerning the salesforce.com information might be explained by - but certainly not excused by - a general lack of familiarity or understanding about ESI.  However, the next subject of this Opinion and Order - what are referred to as the "Frank Mecka Documents" - shows that the problem was not confined to electronically created and stored documents, and it is a variation on the same theme.  Again, there is more background about this issue in the Court's April 3, 2013 Opinion and Order, but the Court will provide a brief summary of the issue here.

Like the Browns, Frank Mecka was a Tellermate sales person; he was discharged in 2009, and subsequently claimed that his discharge was age-related.  Tellermate settled his claims in 2010.  By written request, the Browns asked Tellermate to produce various documents relating to Mr. Mecka, including communications

with him since the date of his termination (Second Set of Document Requests, No. 46) and agreements with him made from a date two months prior to his termination to the present, plus any documents relating to those agreements (Second Set of Document Requests, No. 47).  See Defendant's Hearing Exhibit One.

In response, Tellermate objected to both requests but said that responsive, non-privileged documents, if any, would be produced.  (Plaintiff's Hearing Exhibit 44, Tab B).  It produced a few documents and, in a letter dated February 15, 2013, told the Browns' counsel that those were all of the non-privileged documents relating to Mr. Mecka and that counsel should "cease ... raising any further issues in this regard." (Plaintiff's Hearing Exhibit 48).  At that point, despite withholding documents pursuant to a claim of privilege, Tellermate had not created a privilege log, as required by Fed.R.Civ.P. 26(b)(5)(A), with respect to any additional documents concerning Mr. Mecka.

The Court, in the April 3, 2013 Opinion and Order, noted Tellermate had acknowledged that there were more Mecka documents but was claiming a privilege for those documents under Fed. R. Evid. 408.  Finding that Tellermate had, by never creating a privilege log for these documents, waived any such claim of privilege, the Court ordered Tellermate to produce the documents it was withholding.  Tellermate appealed that decision to Judge Graham.  Judge Graham overruled Tellermate's objections in an Opinion and Order filed on July 29, 2013.  As part of the briefing on its motion for reconsideration of the Magistrate Judge's order, Tellermate had represented that "the only documents withheld on the basis of the settlement privilege afforded by Rule 408, were **two letters** related to a former employee's claims of discrimination by Tellermate and drafts of the Release entered into by and between Defendant Tellermate and its former employee, Michael Stafford. The drafts of the Stafford

-19-

Release were produced subsequent to the April 3rd Opinion and
Order."  See Doc. 44, at 1 n.1 (emphasis supplied).

That statement, like so many others made by Tellermate's
counsel, was false.  After Judge Graham issued his order,
Tellermate produced more than two additional documents.  See
Defendant's Hearing Exhibit 14.  And it also produced a privilege
log on May 22, 2013, which listed an additional **thirty or more**
documents relating to Frank Mecka, but claimed they were subject
to the attorney-client privilege.  That was the first time any
such claim about Frank Mecka documents was made; the arguments
advanced in opposition to the motion to compel rested exclusively
on a Rule 408 privilege, and Tellermate's counsel did not even
hint at the existence of a substantial number of responsive
documents which both existed and which supposedly were protected
from discovery by the attorney-client privilege.  And, of course,
prior to May 22, 2013, Tellermate had not created a privilege log
for these documents, even though its initial response to the
document request was served on July 5, 2012.

The Court asked counsel about this unusual sequence of
events during the hearing.  In particular, Ms. O'Neil was
questioned about it; she agreed that she had represented to the
Court on multiple occasions that there were only two documents
relating to Mr. Mecka that had been withheld on grounds of
privilege, and testified that as of April, 2013, those were the
only documents given to her by Tellermate apart from the handful
of documents that had been produced voluntarily to the Browns.
Ms. O'Neil acknowledged that when she made her arguments to the
Court about these documents, her client, Tellermate "was in
possession of many additional documents related to Mr. Mecka that
[she] was personally unaware of."  (Tr. Vol I, at 270-71).  She
also agreed that the client's untimely disclosure of these
documents to her was no excuse for making an untimely response to

-20-

the document request.  Id. at 272.  Nevertheless, once she
finally got the additional documents, she did not produce them,
but simply created a privilege log for them.  Even after Judge
Graham ruled that Tellermate's belated claim of Rule 408
privilege for the Frank Mecka documents known about at that time
had been waived because it was untimely, Tellermate did not
produce these additional documents.  Finally, Tellermate offered
no explanation for its failure to provide these additional
documents to its counsel as part of its initial response to the
Browns' request for them.

### C. The "Document Dump"

Again, as reflected in the April 3, 2013 Opinion and Order,
the Browns had requested, early on, documents relating to
performance evaluations of various Tellermate employees who,
presumably, had performed better than the Browns - at least
according to Tellermate's claim that the Browns were terminated
for performance-related reasons.  In its response to the motion
to compel, Tellermate said that it had produced all such
documents; however, the Browns pointed out, in their reply,
Tellermate had previously told them, in a letter from counsel
dated November 10, 2012 (see Plaintiff's Hearing Exhibit 47, Tab
E) that the number of such documents was "unlimited" but that
Tellermate would provide the Browns with access to an electronic
database "at a time and place to be agreed on by counsel."
Tellermate subsequently changed its mind about the process and
produced documents instead, but, according to the Browns, they
received only about 20 documents that fell into this category - a
number seemingly inconsistent with the prior representation about
an "unlimited" number of such documents.

The Court did not have enough information before it when it
ruled on the motion to compel to permit it to determine whether
Tellermate or the Browns had the better of this argument.

-21-

However, since Tellermate did not address the issue in its brief
other than to say that all such documents had been produced, the
Court took Tellermate at its word, and simply ordered that, in
accordance with its apparent lack of objection to producing
evaluation-related documents, Tellermate should produce any
additional ones it might possess.

In response to that portion of the order, Tellermate
produced an additional 50,000 pages of documents. The history of
this production well illustrates the lack of communication and
lack of trust which had, by that time, developed between the
parties' counsel, but it also indicates (again) something about
the way that Tellermate's attorneys approached the discovery
issues in this case.

Some brief history is helpful to put this in context.
Although the Browns served several comprehensive document
requests, including a request for documents "discussing,
evaluating, or analyzing the job performance" of a number of
other Tellermate employees (Second Request for Production, Nos.
14-20, a copy of which is attached to Doc. 24, the Browns' first
motion to compel), Tellermate produced only a handful of
documents, claiming that it did not create or maintain formal
performance evaluations for its employees. As Tellermate said in
its response to that motion (Doc. 28), its total response to the
Browns' document requests prior to the filing of the motion was
in the range of "hundreds of documents," but the day the motion
was filed, it produced another 922 documents totaling some 5,900
pages. However, that same filing indicates that none of the
additional documents actually responded to these particular
requests; most of the documents appeared to be sales information
or sales and commission data. Id. at 7-8. As noted above, when
the same subject was raised again in the second motion to compel,
Tellermate responded that it had produced all of the responsive

-22-

documents which existed.

Once the Court issued the April 3, 2013 order, Tellermate decided to produce additional documents supposedly relating to the performance of the its sales representatives.  There is an email string related to this issue which appears multiple times both in filed documents and in exhibits admitted at the hearing; Defendant's Exhibit 17 appears to be a complete copy of that exchange.

According to the emails, the first time Tellermate notified the Browns that it would be producing additional evaluation-related documents was April 22, 2013.  The email dated that date said, among other things, that "[g]iven the breadth of Plaintiffs' discovery request, the data set for this particular category of information includes between 35,000-40,000 records." Ms. O'Neil, who wrote the email, invited the Browns' counsel to "undertake a joint effort to narrow the data set through agreed upon search terms" and asked the Browns to propose such terms. The next day, one of the Browns' attorneys, Jack Chaney, asked what search terms and methods Tellermate had used so that he could better respond to the suggestion that he propose additional search terms.  Ms. O'Neil, by return email, told him that such information was "at least arguably ... subject to the attorney-client privilege and work product protection" - an interesting position to take when she was asking him to provide her with the exact same type of information - but she did tell him that the databases and files of supervisory employees were searched and that the terms "**included** the full names and nicknames of the identified sales personnel."  (Emphasis supplied).  Mr. Chaney viewed the response as evasive because Ms. O'Neil both objected to telling him the actual search terms and methods and was not clear about whether terms other than the names and nicknames of the sales representatives were included.  Rather than continue

the dialogue, he asked that the full set of documents be produced. After a short delay, Tellermate provided over 50,000 pages of new documents.

As it turned out, the only search terms which Tellermate employed to locate these documents were the names and nicknames of the sales personnel. Ms. O'Neil testified that she was ultimately responsible for deciding what search terms to use, but, at the time of the hearing, she was unable to recall the precise protocol adopted for the search. Tr., Vol. III, at 544. Because some of the names and nicknames used are very common (e.g. "Mike"), the production included a very large number of irrelevant and nonresponsive documents. As Ms. O'Neil also testified, she was "hard pressed to say" that the documents produced were "even responsive to the request, because it's just day-to-day email traffic about people doing their jobs. It's not necessarily an evaluation or an assessment or a review or an appraisal." (Tr., Vol. II, at 492-93). This sequence of events is difficult to characterize as an appropriate response to either the initial document request or the Court's order, although Ms. O'Neil explained that she wanted to comply fully with the order and did not want to ask for an extension of the 21 days Tellermate had been given to produce additional documents. It appears to the Court that the press of time, at least as Tellermate perceived it, affected the process as well as the result.

That is not the only issue about this particular set of documents, however. Tellermate marked almost all of the documents - by the Browns' estimate, see Defendant's Exhibit 19, over 99% of them - as "Confidential - Attorneys' Eyes Only." The Court had previously entered a protective order (Doc. 39) which allowed such a designation "when counsel believe[d] in good faith that such material constitutes or reveals a trade secret or other

-24-

confidential research, development, or proprietary business information, and that such material is entitled to a higher level of protection than that afforded to materials designated pursuant to paragraph 1."  Paragraph 1, in turn, allowed parties to designate information as "Confidential" if the party "in good faith believe[d] that such designation is necessary to protect non-public personal, confidential, proprietary or commercially sensitive information...."  Tellermate explained that it marked all of these documents as attorneys'-eyes-only because it viewed Mr. Brown as a business competitor.

The Browns raised an issue about this designation in an email dated August 30, 2013.  The string of emails related to this matter is found, among other places, in Defendant's Exhibit 19.  Mr. Chaney reported, in his email, that Mr. Brown no longer worked for one of Tellermate's competitors and did not intend to do so in the future.  He asked that the "Attorneys' Eyes Only" designation be removed.  As noted in the response, Tellermate refused to do so "across the board" but asked the Browns to be more specific in their proposal (i.e., to designate documents by Bates number or topic) and it would consider the request.  The Browns viewed this proposal as "unworkable" given the large number of documents which had been designated, and asked that they all be marked "Confidential" instead - which was apparently how Tellermate had marked similar documents it had produced before Mr. Brown went to work for a competing company.  This exchange produced another impasse, leading the Browns to file a motion (Doc. 65) to strike the attorneys'-eyes-only designation.  Additional emails attached to that motion show that the Browns did ultimately propose that certain categories of documents, including the performance-related documents, be re-designated, and that Tellermate refused, this time because the possibility existed that Mr. Brown could work for a competitor at some time

in the future.  The motion challenged the attorneys'-eyes-only designation generally, noting that there were many documents so marked (including a picture of a baby) which did not appear to contain anything which was competitively sensitive.  In response to that motion, Tellermate claimed that it had been entitled to mark all of these documents as attorneys'-eyes-only because they were responsive to "Plaintiff's far-reaching requests for Tellermate's most sensitive business information" and that "the volume of the data subject to production and the time within which it was required to be produced" justified its actions. Doc. 74, at 5.

This latter statement seems to be the real justification for designating over 50,000 pages of documents as attorneys'-eyes-only when many of the documents are both irrelevant and unresponsive to the Browns' request for "Tellermate's most sensitive business information."  Ms. O'Neil testified that she knew the document production "was going to be overinclusive," Tr. Vol. III, at 519, and as the testimony quoted above indicates, she did not view a substantial amount of it as having anything to do with evaluations or assessments of the employees in question. It might have been reasonable, in order to produce that volume of documentation within 21 days - assuming, for the moment, that the search protocol was itself a reasonable way to try to locate additional documents, although that is by no means clear - to indulge in some broad overdesignation of documents so long as a subsequent effort was made to correct any errors made in the process.  However, it does not appear to this day that Tellermate has made any effort to do a more precise review of these documents despite the many months that have elapsed since their production or since the Browns first raised the issue.  Even though the matter is the subject of a motion, that does not relieve a party of its duty to supplement or correct discovery

-26-

responses which were erroneous when made, but Tellermate has
shown no inclination to engage in that effort, apparently
preferring to leave the issue to the Court (but, as noted below,
without making even a token effort to defend its obviously
overinclusive designation of documents as attorneys-eyes-only).

### D. Board Minutes and Agendas

The final issue raised by the Browns relates to minutes of
directors' meetings for Tellermate and the associated business
entities.  A few of these were produced; Tellermate has insisted
that no additional responsive documents exist, mainly because it
did not hold formal directors' meetings.  As Mr. Rendell, its
representative at the hearing, testified, the Tellermate
companies ran their businesses through informal meetings of their
executives (some of whom may have been directors as well), and
held formal board meetings only when absolutely necessary.  At
those meetings, operational issues like personnel decisions were
not typically discussed.  The Court will not devote further
discussion to this issue because the Browns did not prove that
Tellermate either withheld documents in this category or made
inaccurate statements about their non-existence.

### IV. Legal Analysis

#### A. Some General Principles about Discovery

All litigants, and all experienced counsel, understand that
the Federal Rules of Civil Procedure authorize broad discovery.
See, e.g., United States v. Leggett & Platt, Inc., 542 F.2d 655,
657 (6th Cir. 1976).  Any matter that is relevant to a party's
claims or defenses - relevant in the sense that it reasonably may
lead to the discovery of admissible evidence, and is not
privileged - is subject to discovery.  The concept of relevance
during discovery is necessarily broader than at trial, Mellon v.
Cooper-Jarrett, Inc., 424 F.2d 499, 500-501 (6th Cir. 1970), and
"[a] court is not permitted to preclude the discovery of arguably

-27-

relevant information solely because, if the information were
introduced at trial, it would be 'speculative' at best." <u>Coleman
v. American Red Cross</u>, 23 F.3d 1091, 1097 (6th Cir. 1994).

It is true that the Court has a duty - emphasized in recent
changes to some of the rules governing discovery - to deny
discovery directed to matters not legitimately within the scope
of Rule 26, and to protect a party or person from harassment or
oppression that may result even from a facially appropriate
discovery request. <u>See generally Herbert v. Lando</u>, 441 U.S. 153,
177 (1979). Additionally, the Court has discretion to limit or
even preclude discovery which meets the general standard of
relevant found in Rule 26(b)(1) if the discovery is unreasonably
duplicative, or the burden of providing discovery outweighs the
benefits, taking into account factors such as the importance of
the requested discovery to the central issues in the case, the
amount in controversy, and the parties' resources. <u>See</u> Fed. R.
Civ. P. 26(b)(2).

In addition to the idea that discovery is broad and is
designed to permit parties to obtain enough evidence either to
prove their claims or disprove the opposing party's claim,
discovery under the Federal Rules of Civil Procedure has been
designed to be a collaborative process. As one Court observed,

> It cannot seriously be disputed that compliance with
> the"spirit and purposes" of these discovery rules
> requires cooperation by counsel to identify and fulfill
> legitimate discovery needs, yet avoid seeking discovery
> the cost and burden of which is disproportionally large
> to what is at stake in the litigation. Counsel cannot
> "behave responsively" during discovery unless they do
> both, which requires cooperation rather than contrariety,
> communication rather than confrontation.

<u>Mancia v. Mayflower Textile Servs. Co.</u>, 253 F.R.D. 354, 357-58
(D. Md. 2008). Such a collaborative approach is completely
consistent with a lawyer's duty to represent his or her client

zealously.  See Ruiz-Bueno v. Scott, 2013 WL 6055402, *4 (S.D. Ohio Nov. 15, 2013).  It also reflects a duty owed to the court system and the litigation process.

The mandatory disclosure provisions of Rule 26(a) and the various "meet and confer" obligations imposed by Rule 26(f) are clear indicators that counsel are required to approach discovery cooperatively.  Rule 26(f) requires the parties to meet and confer early in the case to discuss, among other matters, "any issues about disclosure or discovery of electronically stored information, including the form or forms in which it should be produced...."  Fed. R. Civ. P. 26(f)(3)(C).  That discussion can and should include cooperative planning, rather than unilateral decision-making about matters such as "the sources of information to be preserved or searched; number and identities of custodians whose data will be preserved or collected...; topics for discovery; ... [and] search terms and methodologies to be employed to identify responsive data...."  Milberg LLP and Hausfeld LLP, "E-Discovery Today: The Fault Lies Not in Our Rules...," 4 **Fed. Cts. L. Rev.** 131, 163 (2011).  When that occurs, each party is able to exert some measure of control over the e-discovery process, and, in turn, to have some measure of confidence in the results.

Finally, counsel's obligation to approach discovery cooperatively and in good faith is governed, in part, by Fed.R.Civ.P. 26(g).  That rule says, in relevant part, that every time an attorney signs a disclosure, discovery response, or objection, the attorney is certifying that "to the best of the [attorney's] knowledge, information, and belief **formed after a reasonable inquiry**, the statements the attorney is making are "consistent with the[] rules," "warranted by existing law or by a nonfrivolous argument" for extending or changing the law, "not interposed for any improper purpose," and not unduly burdensome

-29-

or unreasonable.  That obligation is backed up by sanctions as
provided in Rule 26(g)(3).  Those sanctions can be imposed if an
attorney fails in his or her "duty to make a reasonable
investigation to assure that their clients have provided all
available responsive information and documents." Bernal v. All
American Investment Realty, Inc., 479 F.Supp.2d 1291, 1333 (S.D.
Fla. 2007).  This rule, like the parallel provisions of
Fed.R.Civ.P. 11, contains "an objective standard" governing the
reasonableness of counsel's actions, see National Ass'n of
Radiation Survivors v. Turnage, 115 F.R.D. 543, 555 (N.D. Cal.
1987), so that counsel may not simply plead lack of subjective
good faith as a way to avoid sanctions.  "An attorney has made a
'reasonable inquiry' if the 'investigation undertaken by the
attorney and the conclusions drawn therefrom are reasonable under
the circumstances.... Ultimately, what is reasonable is a matter
for the court to decide on the totality of the circumstances.'"
Quinby v. WestLB AG, 2005 WL 3453908, *4 (S.D.N.Y. Dec. 15,
2005), quoting the 1983 Advisory Committee Notes to Rule 26.

### B.  The Salesforce.com Issue

The Court begins its analysis of the salesforce.com issue by
quoting directly from Paul Rendell, Group Managing Director of
Tellermate Group.  When questioned by the Court concerning the
salesforce.com documents, Mr. Rendell candidly admitted the crux
of what happened here:

> THE COURT: ... [T]he problem I see is that there were
> these direct representations, and again, I will read what
> it says here [paraphrasing Ms. O'Neil's February 15, 2013
> letter to Jack Chaney, one copy of which is Attachment to
> Plaintiff's Hearing Exhibit 47]:  "Tellermate does not
> possess or control data maintained in the
> SalesForce.comdatabase.  It is not at liberty to produce
> it during discovery.  It cannot access any information
> plaintiffs may have logged into SalesForce.com during the
> time of their employment."
>
> None of those things are true, are they?

-30-

          THE WITNESS: No, they are not.

(Tr. Vol. II, at 384).  Did Tellermate comply with its duty
under the Rules to provide full, truthful, and appropriate
discovery responses, and did its counsel make a reasonable
investigation before taking Tellermate at its word?  The
answer to these questions is clearly no.

          Tellermate, as an entity, knew that every statement it made
about its control over, and ability to produce, the
salesforce.com records was not true when it was made.  It had
employees who could have said so - including its salesforce.com
administrators - had they simply been asked.  Its representations
were illogical and were directly contradicted by the Browns, who
worked for Tellermate, had salesforce.com accounts, and knew that
Tellermate could access those accounts and the information in
them.  And yet Tellermate's counsel made these untrue statements
repeatedly, in emails, letters, briefs, and during informal
conferences with the Court, over a period of months, relenting
only when the Court decided that it did not believe what they
were saying.  This type of behavior violated what has been
referred to as "the most fundamental responsibility" of those
engaged in discovery, which is "to provide honest, truthful
answers in the first place and to supplement or correct a
previous disclosure when a party learns that its earlier
disclosure was incomplete or incorrect."  Lebron v. Powell,
217 F.R.D. 72, 76 (D.D.C. 2003).  "The discovery process created
by the Federal Rules of Civil Procedure is premised on the belief
or, to be more accurate, requirement that parties who engage in
it will truthfully answer their opponents' discovery requests and
consistently correct and supplement their initial responses."
Id. at 78.  That did not happen here.

          One can only guess at why Tellermate was apparently unable

                              -31-

or unwilling to ask the right people the right questions before
telling its counsel these untruths.  Perhaps the people it
charged with interacting with counsel in this case so
misunderstood the salesforce.com situation that they did not
think to investigate it further; perhaps they knew the truth all
along but feared that the information would help the Browns and
hurt Tellermate.  The end result is the same, however.  The
Browns did not get this discovery timely; they were forced,
unnecessarily, to spend time and money trying to resolve the
matter informally, with the Court, and, eventually, by way of
motions practice; and by the time they got it, due to
Tellermate's failure to preserve the evidence properly, they had
no way of knowing how much of it was still reliable and accurate.

     But it is not fair to place the entire blame on Tellermate,
even if it must shoulder the ultimate responsibility for not
telling counsel what, collectively, it knew or should have known
to be the truth about its ability to produce the salesforce.com
information.  As this Court said in Bratka, in the language
quoted above at page 3, counsel cannot simply take a client's
representations about such matters at face value.  After all,
Rule 26(g) requires counsel to sign discovery responses and to
certify their accuracy based on "a reasonable inquiry" into the
facts.  And as Judge Graham (who is, coincidentally, the District
Judge presiding over this case as well, and whose views on the
obligations of counsel were certainly available to Ms. O'Neil and
Mr. Reich), said in Bratka, 164 F.R.D. at 461:

> The Court expects that any trial attorney appearing as
> counsel of record in this Court who receives a request
> for production of documents in a case such as this will
> formulate a plan of action which will ensure full and
> fair compliance with the request.  Such a plan would
> include communicating with the client to identify the
> persons having responsibility for the matters which are
> the subject of the discovery request and all employees
> likely to have been the authors, recipients or custodians

of documents falling within the request. The plan should ensure that all such individuals are contacted and interviewed regarding their knowledge of the existence of any documents covered by the discovery request, and should include steps to ensure that all documents within their knowledge are retrieved. All documents received from the client should be reviewed by counsel to see whether they indicate the existence of other documents not retrieved or the existence of other individuals who might have documents, and there should be appropriate follow up. Of course, the details of an appropriate document search will vary, depending upon the circumstances of the particular case, but in the abstract the Court believes these basic procedures should be employed by any careful and conscientious lawyer in every case.

Here, counsel apparently never identified the persons having responsibility for salesforce.com information, which would have included those Tellermate employees (named by the Browns in their document request) whose salesforce.com accounts were being requested, or the persons designated by Tellermate as its salesforce.com administrators.  Ms. O'Neil specifically testified that she never spoke to Mr. Schneid, one of the two salesforce.com administrators, before he left the company (which was well after this case was filed).  Similarly, it does not appear that counsel took any steps to insure that documents available to the appropriate group of people were retrieved.  And there cannot have been any appropriate follow-up to the Browns' affidavit about their ability to access salesforce.com information, or the truth would have come out at that point. Further, it is hard to overemphasize the fact that none of these representations made any sense at all in light of the way in which Tellermate employees used salesforce.com to improve their sales performance; if they could not go back and see the information after they entered it, it was of little use to them, and Tellermate would not have paid for the licenses for them to

use it.  Finally, to make matters worse, counsel interjected the
totally frivolous argument that the licensing agreement prevented
Tellermate from obtaining and disclosing its own information,
when the terms of that agreement said just the opposite.  This
was more than just an abdication of responsibility; it was
deliberate obfuscation of the issue.

As the facts also demonstrate, this course of conduct was in
direct violation of the duty, imposed by federal common law, to
preserve relevant evidence.  See, e.g., Adkins v. Wolever, 554
F.3d 650 (6th Cir. 2009)(federal law is to be applied in a case
involving spoliation of evidence); see also Beaven v. United
States Dept. of Justice, 622 F.3d 540, 553 (6th Cir. 2010)(duty
to preserve evidence arises when a party knows or should know
that the evidence is relevant to future litigation).  Tellermate
knew from the outset that its termination of the Browns was
premised on their allegedly inadequate sales performance, making
the performance of other sales managers or representatives
crucial evidence in the case.  See, e.g., Manzer v. Diamond
Shamrock Chem. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)(one way
for a fired employee claiming age discrimination to demonstrate
pretext "consists of evidence that other employees, particularly
employees not in the protected class, were not fired even though
they engaged in substantially identical conduct to that which the
employer contends motivated its discharge of the plaintiff"),
overruled on other grounds Geiger v. Tower Auto., 579 F.3d 614
(6th Cir. 2009).  In fact, that was exactly why the Browns asked
for the salesforce.com information for themselves and other
Tellermate employees.  Therefore, it should have been obvious
from the outset that failing to preserve the integrity of this
information would threaten the fairness of the judicial
proceedings.

This is also an area where counsel has significant

-34-

responsibilities, especially where ESI is involved.  As one
Court noted:

> The duty to preserve potentially relevant evidence is an
> affirmative obligation that a party may not shirk.  When
> the duty to preserve is triggered, it cannot be a defense
> to a spoilation claim that the party inadvertently failed
> to place a "litigation hold" or "off switch" on its
> document retention policy to stop destruction of that
> evidence.   As  discoverable  information  becomes
> progressively digital, e-discovery including e-mails and
> other electronic documents, plays a larger, more crucial
> role in litigation.

Mosaid Tech., Inc. v. Samsung Elec. Co., Ltd., 348 F. Supp.2d
332, 339 (D.N.J. 2004).

Like any litigation counsel, Tellermate's counsel had an
obligation to do more than issue a general directive to their
client to preserve documents which may be relevant to the case.
Rather, counsel had an affirmative obligation to speak to the key
players at Tellermate so that counsel and client together could
identify, preserve, and search the sources of discoverable
information.  See Cache La Poudre Feeds, LLC v. Land O' Lakes,
Inc., 244 F.R.D. 614, 629 (D. Colo. 2007).  In addition, "counsel
cannot turn a blind eye to a procedure that he or she should
realize will adversely impact" the search for discovery.  Id.
Once a "litigation hold" is in place, "a party cannot continue a
routine procedure that effectively ensures that potentially
relevant and readily available information is no longer
'reasonably accessible' under Rule 26(b)(2)(B)."  Id.

The failure to preserve the integrity of the salesforce.com
information is just a different side of the same coin as the
failure to produce it.  Both shortcomings were premised on the
basic inability to appreciate whose information it was and who
controlled it.  Apart from the fact that the licensing agreement
and common sense suggested the information was Tellermate's, and
the fact that inquiries made to the right people would have

confirmed that, counsel did seem to appreciate the fact that the information was constantly changing, and also the fact that Tellermate was not making any record of these changes or maintaining the integrity of the data.  As to the first point, Ms. O'Neil said, in the February 15, 2013 letter quoted earlier, that "no one from Tellermate can speak to the validity or authenticity of ESI in the salesforce.com database and cannot verify its accuracy," see Doc. 33, Exhibit A – a real problem if, as it turned out, the information was actually Tellermate's and was subject to a preservation request.  And as to the second, in its memorandum in opposition to the motion to compel, one of the few true statements made about the salesforce.com issue is that "Tellermate does not maintain, back up, or store the [salesforce.com] information."  See Doc. 33, at 4.  Even after the Court ruled that Tellermate had to produce the information, and after the production which took place on May 9, 2013, it does not appear that Tellermate took any steps to preserve the information which existed at that time; the first time it even asked salesforce.com for backup information was in January, 2014. The failure to make any effort to preserve this information subsequent to receiving the preservation letter, or to do so while the issue of its discoverability was being litigated, was, for the reasons cited above, both misguided and irrational.  The failure to take steps to preserve it after the Court's order to produce it – especially when counsel had already conceded that the information was changing constantly and could not be verified (at least under Tellermate's approach to preservation, which was to do nothing itself and not to ask salesforce.com to do anything either) – is just baffling.  January, 2014 was fairly late in the game to attempt to confirm the (mistaken) assumption that salesforce.com was doing the preservation work which was Tellermate's responsibility all along.  Again, given that most of

-36-

this failure to preserve occurred after suit, and while counsel
was embroiled in the discovery dispute, much of this
responsibility must be shared by Tellermate and its attorneys.

C. <u>The Other Discovery Issues</u>

It should not require much further discussion to see that
sanctionable conduct has occurred here with respect to discovery
concerning the Browns' claim that performance was a pretext for
firing them based on their age.  The other discovery issues in
this case are, while significant in their own right, more helpful
in determining the level of appropriate sanctions.  That is
because they are evidence that the salesforce.com situation was
not a stand-alone occurrence, but part of what appears to have
been a pattern of Tellermate's failure either to learn or
communicate the truth about matters related to discovery, and its
counsel's failure to make the reasonable inquiries required by
Rule 26(g).

As noted above, Tellermate and its counsel also made false
representations to opposing counsel and the Court concerning the
existence of documents relating to the Frank Mecka matter.
Indeed, at the hearing on the pending motions, Tellermate's
counsel stated that she was unaware of the existence of the great
majority of the Frank Mecka documents until almost a year after
they were requested.  Once again, it is not sufficient to send
the discovery request to a client and passively accept whatever
documents and information that client chooses to produce in
response.  <u>See Cache La Poudre Feeds</u>, 244 F.R.D. at 629.
Moreover, as counsel admitted, Tellermate's untimely disclosure
of the documents did not excuse the late response to the Browns'
request for these documents  Finally, if Tellermate intended to
withhold these documents on privilege grounds, it had a duty to
raise that claim on a timely basis.  It failed to do so here both
with respect to the Rule 408 privilege claim and, more

-37-

egregiously, with respect to the attorney-client privilege claim.
See, e.g., Pulsecard, Inc. v. Discover Card Servs., Inc., 168
F.R.D. 295, 302 (D. Kan. 1996) (finding that objections raised by
defendants in response to plaintiff's motion to compel discovery
were untimely, where defendants failed to raise such objections
in response to plaintiff's initial requests for discovery).  The
actions of Tellermate and its counsel with respect to the Mecka
documents again impaired the Browns' ability to pursue this
discovery in a timely and cost-efficient manner.

Tellermate's overall approach to discovery is also
demonstrated by how counsel handled the "Document Dump."  By the
time that Tellermate and its counsel provided the Browns with
over 50,000 pages of information largely consisting of irrelevant
and unresponsive documents, there was an understandable lack of
trust between counsel.  Had Tellermate's counsel simply answered,
directly, how Tellermate conducted the search, there could have
been a dialogue.  But she did not, and she raised an improper
objection as well as being less than straightforward about the
search terms.  As this Court has noted, "discussing how to go
about searching for and producing ESI does not ordinarily or
necessarily entail revealing confidential client communications."
Ruiz-Bueno, 2013 WL 6055402, *4.  Consequently, the "Document
Dump" is but another example of how Tellermate and its counsel
eschewed transparency and cooperation in the discovery process.

The issue of the "Attorneys' Eyes Only" designation
represents the final chapter in this saga.  The protective order
permitted this designation to be made only when counsel held a
good faith belief that such material constituted or revealed a
trade secret or other confidential research, development, or
proprietary business information, and that such material was
entitled to a higher level of protection than otherwise provided
in the protective order.  As the producing party, Tellermate had

-38-

the burden of demonstrating entitlement to the designation.  <u>See</u>
<u>Proctor & Gamble Co. v. Nabisco Brands, Inc.</u>, 111 F.R.D. 326, 328
(D. Del. 1986).  Although Tellermate and its counsel claim that
the designation was warranted because the Browns are Tellermate's
competitors, this unsupported argument does not satisfy their
burden of demonstrating that the documents at issue were entitled
to the higher level of protection.  <u>See THK Am., Inc. v. NSK Co.,</u>
<u>Ltd.</u>, 157 F.R.D. 637, 646 (N.D. Ill. 1993).  The alleged burden
imposed by a high volume production does not provide the
producing party or its counsel free reign to choose a given
designation and ignore the Court's order pertaining to that
designation.  <u>See, e.g., Minter v. Wells Fargo Bank, N.A.</u>, 2010
WL 5418910, *2 (D. Md. Dec. 23, 2010)(finding that "defendants
act at their own peril in continued unexamined and quite apparent
over-designation" of documents).

In fact, this Court has spoken quite recently on what must
be shown in order to resist a request to remove an attorneys'-
eyes-only designation from documents produced during discovery.
In <u>Penn, LLC v. Prosper Business Development Corp.</u>, 2012 WL
5948363, *4 (S.D. Ohio Nov. 28, 2012), the Court said:

> An AEO designation is "the most restrictive possible
> protective order," as it confines dissemination of
> discovery materials only to the opposing party's
> attorneys and other consultants/experts specified in the
> agreement. <u>See Waite, Schneider, Bayless & Chesley Co.,</u>
> <u>LPA v. Davis</u>, No. 1:11-cv-0851, 2012 U.S. Dist. LEXIS
> 117634, at *14, 2012 WL 3600106 (S.D.Ohio Aug. 21, 2012).
> A party seeking this designation must describe the
> alleged harm it will suffer from any disclosure " 'with
> a particular and specific demonstration of fact, as
> distinguished from stereotyped and conclusory
> statements.' " <u>Id</u>. (quoting <u>Nemir v. Mitsubishi Motors</u>
> <u>Corp.</u>, 381 F.3d 540, 550 (6th Cir.2004)). "In the
> business context, such a showing requires 'specific
> demonstrations of fact, supported where possible by
> affidavits and concrete examples.' " <u>Id</u>. at *14-15
> (quoting <u>Deford v. Schmid Prod. Co.</u>, 120 F.R.D. 648, 653
> (D.Md. 1987)).

There are two important take-aways from this language.  The first is that the question of whether competitive harm would result from the disclosure of these types of documents to a competitor is a factual issue.  Courts decide such issues on the basis of evidence.  Under Local Civil Rule 7.2(e), that evidence must take the form of "affidavits, declarations pursuant to 28 U.S.C. §1746, deposition excerpts, admissions, verified interrogatory answers, and other documentary of electronic exhibits."  Additionally, that evidence must "be attached to the memorandum [in opposition] or in an appendix thereto." Tellermate's opposing memorandum on this issue, however, is not accompanied by any evidence about the harm which might result from the Browns' viewing of any particular document which was designated as attorneys'-eyes-only.

The second is that the showing of harm must be particularized, and cannot simply rest on conclusory statements. Tellermate's entire argument as to harm, however, is conclusory. Apart from the general concept that disclosure of some types of sensitive information to a competitor may result in harm, it contains no particularized argument which is specific to Mr. Brown, the way in which he was competing with Tellermate, and how the disclosure of any one of the 50,000 pages marked as attorneys'-eyes-only would harm Tellermate's interests.  In fact, Tellermate appears to take the position that unless Mr. Brown identified, preferably by Bates number, each document he wanted to be redesignated, it had no choice but to continue to claim that all of the documents were properly marked.  The protective order (Doc. 39) which it cites for that proposition not only does not say that - it requires only that the opposing party make a

-40-

written challenge to the designation of "any document or information," see ¶12 - but the order is also, by law, is subject to the provisions of Fed.R.Civ.P. 26(c), which place the burden of proof of confidentiality on the designating party.  See, e.g., Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Grp., Inc., 121 F.R.D. 264, 268 (M.D. N.C. 1988)("the burden of proving confidentiality never shifts from the party asserting that claim ...").  Despite the fact that Tellermate has never come close to meeting that burden, and did not even attempt, in its opposing memorandum, to make the necessary particularized showing of harm, it has, to this day, made no effort to redesignate a single page of the documents.  Its continued obligation to adhere to its obligations in discovery did not disappear just because there was motions practice directed to the issue.

V.  <u>The Appropriate Sanction</u>

Sanctions in this case are available under Fed.R.Civ.P. 26(g)(3)(making a discovery certification in violation of Rule 26(g) without substantial justification); Rule 37(a)(3)(c)(B)(iv) (failure to permit inspection of documents); Rule 37(b)(2)(failing to comply with a court order to provide or permit discovery); 28 U.S.C. §1927 and the Court's inherent power to impose sanctions, see Jones v. Illinois Central R. Co., 617 F.3d 843, 854 (6th Cir. 2010); and the common law relating to spoliation of evidence.  Tellermate's conduct, as documented in this Opinion and Order, cuts across these various sources of authority.  While each addresses somewhat different behavior and reflects somewhat different concerns (although there are substantial areas of overlap), they have a common theme.  Where a defendant is guilty of "gross negligence and lack of good faith in complying with plaintiff's discovery requests and the Court's discovery order[s]," sanctions are necessary.  Bratka, 164 F.R.D. at 463.  That describes this case.

Bratka is also instructive on the type of sanction which is appropriate.  As Judge Graham noted, "[i]f litigants are to have any faith in the discovery process, they must know that parties cannot fail to produce highly relevant documents within their possession with impunity. Parties cannot be permitted to jeopardize the integrity of the discovery process by engaging in halfhearted and ineffective efforts to identify and produce relevant documents."  Id.  There, the Court imposed a default judgment on the issue of liability both in order to punish the defendant and deter other litigants from engaging in similar conduct, but also because the documents which were withheld were relevant to issues of fault and proximate cause.  The Court also imposed attorneys' fees incurred in connection with the motion.

The Court is mindful that, in choosing the correct sanction, it must consider whether punishment short of entering a default as to liability, or some issue connected with liability, would be sufficient to address the magnitude of the misconduct involved. See, e.g., Bank One of Cleveland, N.A., v. Abbe, 916 F.2d 1067 (6th Cir. 1990).  Extreme sanctions must also be premised upon a finding of willfulness, bad faith, or fault, and must take into account the extent of any prejudice to the adverse party, and whether the offending party had fair notice of the possibility of sanctions.  See Regional Refuse Sys. Inc. v. Inland Reclamation Co., 842 F.2d 150, 153-55 (6th Cir. 1988).

Certainly, an award of attorneys' fees for all motions practice connected to the salesforce.com issue and the Mecka documents is appropriate.  Had Tellermate and its counsel simply fulfilled their basic discovery obligations, neither of these matters would have come before the Court, or at least not in the posture they did.  The Browns had to go to extraordinary lengths to obtain the documents, and, even after two rounds of motions practice, still do not have the majority of the Mecka documents despite what was clearly an untimely effort to assert the attorney-client privilege.  They also do not have proper access

-42-

to the attorneys'-eyes-only documents, despite the complete lack
of evidence that a single one of these documents was properly so
designated, and despite Tellermate's failure to recognize, in its
opposing memorandum, that it had the burden to articulate and to
prove, by competent evidence, its claim of harm which would
result if any of the documents were viewed by the Browns.  That,
too, warrants fees under Rule 37(a)(5)(A), since the opposition,
as filed, was not "substantially justified."

     The Court can, of course, attempt to remedy some of the harm
caused by Tellermate's actions by directing it to produce the
balance of the Mecka documents and to remove the attorneys'-eyes-
only designation from the 50,000 pages of documents which were
categorized in that fashion.  That would give the Browns some
additional information, although very late in the process.  If
those were the only two issues here, that might be sufficient.
But those are, in the overall context of this case, the less
serious transgressions.  The salesforce.com issue must drive the
Court's choice of sanctions.

     There are two distinct but related problems with trying to
remedy Tellermate's failings concerning these documents.  The
first is the extremely serious nature of its, and counsel's,
strenuous efforts to resist production of these documents and the
strident posture taken with both opposing counsel and the Court.
Perhaps the most distressing aspect of the way in which this was
litigated is how firmly and repeatedly counsel represented
Tellermate's inability to produce these documents coupled with
the complete absence of Tellermate's compliance with its
obligation to give counsel correct information, and counsel's
complete abdication of the responsibilities so well described by
this Court in Bratka.  At the end of the day, both Tellermate's
and its counsel's actions were simply inexcusable, and the Court
has no difficulty finding that they were either grossly negligent
or willful acts, taken in objective bad faith.

     The second, related problem, is the failure to preserve the

evidence in a way that either the Browns or Tellermate can rely
on it.  By the time it was finally produced - and that production
was made immensely more difficult by Tellermate's failure to
disclose that it had changed the names on both accounts - almost
two years had passed since Tellermate made its decision to
terminate the Browns' employment.  By the time Tellermate
produced the information in more workable form, by doing a
document export - something it had the capability to do at any
time, and something it was responsible for knowing even if it was
subjectively ignorant of that procedure - the information had
been subject to alteration for almost two-and-a-half years.  It
was only then that Tellermate made the first effort not to
preserve the information's integrity, but simply to find out
whether someone else had been doing that.  Again, it is hard to
overstate the degree of negligence or willful misconduct involved
here.  The evidence shows that counsel was subjectively aware
that the salesforce.com database was changing and had already
changed by the time serious debate began about whether Tellermate
could produce it, and, at the same time, that no one - not
counsel, not Tellermate - was either attempting to preserve the
database's integrity nor even asking whether that was being done.

    These actions have produced this dilemma.  The Browns need
evidence to make out their claim that performance issues were a
pretext for age discrimination.  Because Tellermate professes not
to have done formal performance evaluations of its
representatives, the most comprehensive evidence of their
performance (and the Browns' own performance) appears to be the
salesforce.com information.  But that information cannot be
trusted, and even a forensic computer expert has no way to detect
what changes, deletions, or additions were made to the database
on an historical basis.  Consequently, even a sanction like
forcing Tellermate to pay for the entire cost of a comprehensive
examination of the database and an extraction of all relevant
performance-related information would do nothing to guarantee

that the information was reliable. And precluding Tellermate from contesting the accuracy of the information would not help, either, because any introduced inaccuracies in the database - with their timing and content unknown and unknowable - might actually favor Tellermate.

The only realistic solution to this problem is to preclude Tellermate from using any evidence which would tend to show that the Browns were terminated for performance-related reasons. Tellermate has argued in its summary judgment motion (Doc. 52) that the Browns have no direct evidence of age discrimination and cannot establish a prima facie case under the McDonnell-Douglas framework. Those arguments would not be affected by the sanction imposed here. However, Tellermate would be precluded from relying on any performance-based criteria in support of its argument that it had a legitimate non-discriminatory reason for terminating the Browns' employment, since it has essentially prevented the Browns from learning how their performance compared to other sales representatives at the time. This sanction is commensurate with the harm caused by Tellermate's discovery failures, and is also warranted to deter other similarly-situated litigants from failing to make basic, reasonable inquiries into the truth of representations they make to the Court, and from failing to take precautions to prevent the spoliation of evidence. It serves the main purposes of Rule 37 sanctions, which are to prevent parties from benefitting from their own misconduct, preserving the integrity of the judicial process, and deterring both the present litigants, and other litigants, from engaging in similar behavior. See Jobe O. v. Pataki, 2007 WL 844707, *4 (S.D.N.Y. March 15, 2007), citing Update Art, Inc. v. Modiin Publ'g, Ltd., 843 F.2d 67, 71 (2d Cir. 1988). It is also an appropriate response to the spoliation of evidence. See, e.g., Ogin v. Ahmed, 563 F.Supp.2d 539, 545 (M.D. Pa. 2008)(listing "suppression of evidence" as one sanction available for spoliation). Of course, it is also appropriate to award

-45-

attorneys' fees and costs which the Browns have incurred in connection with moving to compel discovery concerning the salesforce.com documents and the Mecka documents, and those fees and expenses incurred in filing and prosecuting the motion for sanctions and the motion relating to the attorneys-eyes-only documents.  The Court will permit the Browns to file a properly-supported motion for costs and fees within thirty days.

VI. Conclusion

For all of the reasons set forth above, the Court grants the motion for judgment and the motion to strike (Docs. 60 and 65) as follows.  Tellermate shall not, in connection with either the pending summary judgment motion or at trial, be entitled to present or rely upon evidence that it terminated the Browns' employment for performance-related reasons.  The documents produced by Tellermate in April, 2013 and designated as attorneys'-eyes-only may be used by the Browns without restriction, subject to Tellermate's ability to redesignate particular documents as confidential under the existing protective order, provided it does so within fourteen days and has a good faith basis for so designating each particular document.  Tellermate shall produce the remaining Frank Mecka documents to the Browns within fourteen days.  Finally, Tellermate and its counsel shall pay, jointly, the Browns' reasonable attorneys' fees and costs incurred in the filing and prosecution of those two motions as well as in the filing of any motions to compel discovery relating to the salesforce.com and Frank Mecka documents.  The Browns shall file a properly-supported motion for such fees and costs within thirty days.

VII. Motion for Reconsideration

Any party may, within fourteen days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge.  28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 14-01, pt. IV(C)(3)(a).  The motion must specifically designate the

-46-

order or part in question and the basis for any objection. Responses to objections are due fourteen days after objections are filed and replies by the objecting party are due seven days thereafter. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This order is in full force and effect even if a motion for reconsideration has been filed unless it is stayed by either the Magistrate Judge or District Judge. S.D. Ohio L.R. 72.3.

/s/ Terence P. Kemp
United States Magistrate Judge